# raiser&kenniff
## ATTORNEYS AT LAW

Steven M. Raiser        87 Walker Street, 2nd Floor        Of Counsel
Thomas A. Kenniff        New York, NY 10013        Anthony J. Colleluori
Douglas M. Reda        Tel. 212-274-0090 • Fax (888) 688-1765        Marc S. Albert

July 20th, 2023

**VIA ECF & EMAIL**
The Honorable John G. Koeltl
United States District Judge
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, New York 10007-1312
koeltlnysdchambers@nysd.uscourts.gov

> Re:   *United States v. Edward D. Mullins*
>        *Case No. 1:22-cr-00120-JGK*

Dear Judge Koeltl:

This office respectfully submits this memorandum in advance of Edward D. Mullins sentencing, which is scheduled for August 3rd, 2023. For the reasons set forth below, the defense requests that the Court impose a non-incarceratory sentence.

### Procedural History

This past January, Mr. Mullins pled guilty to the underlying felony information charging him with one count of wire fraud (18 U.S.C § 1343).[1] Mr. Mullins admitted to stealing approximately $600,000, over several years, by submitting inflated expense reports to the Sergeant Benevolent Association ("SBA"). His plea was pursuant to a Government sponsored plea agreement, with a stipulated sentencing guideline range of 33 to 41 months.

### Mr. Mullins' Personal History

Mr. Mullins is 61 years old. He was born and raised in Greenwich Village under austere circumstances. One of four children, his father, Edward, was a longshoreman on the West Side docks and his mother, Carmen Lopez-Mullins, was a homemaker. There was significant dysfunctionality in the home, that is set forth in more detail in the Presentence Report ("PSR"). The PSR notes that Mr. Mullins appeared uncomfortable discussing his upbringing during his presentence interview and described it simply as "not suitable for a child." (PSR ¶ 53).

---

[1] Following his initial presentment, Mr. Mullins, through his prior counsel, had waived indictment and agreed to be prosecuted by information.

Manhattan Office
87 Walker Street, 2nd Fl
New York, NY 10013
212-274-0090

www.raiserandkenniff.com

Suffolk Office
150 Motor Parkway, Suite 401
Hauppauge, NY 11788
888-504-2746

Mr. Mullins grew up in Greenwich Village when crime was rampant.  At the age of 13, he began working at a local pharmacy and liquor store.  His after-school jobs were intended to help his family's limited income and to keep him from falling in with the wrong crowd, as did his involvement with sports and his parents' emphasis on religious observance.

The adversity Mr. Mullins endured during his childhood made him determined to do better for his own children.  Although his 20-year marriage to Angela Lawlor-Mullins ended in divorce, his two twin sons, Matthew and Michael, enjoyed the sort of stable upbringing that he never knew.  Ed and Angela raised their children in Port Washington, in the home where Mr. Mullins and Michael, a law student at Pace University, still reside.  Matthew is a financial advisor residing in New Jersey.

Although they underwent a contentious divorce, Angela spoke favorably of Mr. Mullins when interviewed by probation.  While acknowledging the "trauma" that the publicity surrounding Mr. Mullins' misconduct has brought on their children, she remains emotionally supportive and hopes the Court will show leniency at sentencing, taking into account the many good things he has done over the course of his career (PSR ¶ 57).

<u>Mr. Mullins' NYPD Career and Ascent to SBA Leadership</u>

Mr. Mullins was only 20 years old when he joined the New York City Police Department ("NYPD").  After nearly 10 years on patrol, he was promoted to detective and then sergeant.  His assignments included the Detective Bureau in Brooklyn South, Special Victims Squad, and the Kings County District Attorney's Office Squad.  As a detective, he served as a delegate to the PBA and SBA, where he learned labor management.   In 2002, he was elected president of the SBA and would serve in that position for almost 20 years.

While the stain of this conviction will forever tarnish Mr. Mullins' SBA tenure, it does not define it.  Nor must it erase the many years of faithful service he devoted to the SBA, and the successes the organization achieved under his leadership.  As SBA president, Mr. Mullins oversaw the daily functions of the 13,000-member union, while serving as the organization's chief spokesman, advocate, and visionary.  Mr. Mullins served as chairman and trustee to the SBA's health and annuity funds, as well as trustee for the New York City police pension fund.  He was instrumental in the matter of *Mullins vs. the City of New York*, a near decade long litigation that resulted in a $20,000,000 settlement and overtime wage protections for SBA members.  This settlement covered 11 years of unpaid overtime for over 4,300 members and was a profound achievement for his members (see, "**<u>Exhibit A</u>**, P.5 ", letter from Mr. Steven Marron).

<u>Mr. Mullins' Good Works and Volunteerism</u>

Despite the demands of his high-profile position, Mr. Mullins dedicated himself to a host of benevolent causes.  He was appointed to the Advisory Committee on Apprenticeships by the United States Secretary of Labor and served as National Co-Chairman for First Responders on the McCain Leadership Team.  He was a member of the Board of Directors for Building Bridges of Long Island and a volunteer firefighter in Nassau County.  He served as head coach of the men's ice hockey team at New York University and is a member of the American College Hockey Coaches Association, the Amateur Hockey Coaches Association, USA Hockey, and the National Association of Fitness Professionals.  In addition to coaching at the collegiate level, he has dedicated countless hours to coaching youth hockey on Long Island.

Several of the attached character letters speak to Mr. Mullins' devotion to good works and charitable causes.  Some speak of how Mr. Mullins inspired them to become more involved in charitable work through the SBA, in particular the Widows and Children's Fund, and the "Blue Christmas" charity, which he created to deliver Christmas presents to underprivileged New York City children (see, "**Exhibit A**, P. 3" letter from Mr. Glenn Isaacs).

Among Mr. Mullins' many accolades, he is a Knight of the Equestrian Order of the Holy Sepulchre; recipient of the Ellis Island Award; the Dr. Martin Luther King Award from District Council 37, Local 1457; named Man of the Year by the Hispanic Society/NYPD; and similarly honored by the New York State Shields; the Deborah Hospital Foundation, the Bronx; Brooklyn and Queens Conservative Committee; the Emerald Isle Immigration Center and the NYPD Retired Detectives' Association.

Perhaps more poignant than any award are the many people who have spoken of the personal instances of empathy Mr. Mullins showed toward his fellow officers and their families. A former colleague at the SBA describes being "very touched" with how Mr. Mullins related to the family of a fallen officer.  He describes how "Mr. Mullins would personally call the family to check on their well-being," and ensure that they were sent gifts and included in invitations to SBA events (see, "**Exhibit A**, P. 1", letter from Mr. Robert Mladinich).  It is these quiet acts of compassion, absent from any plaque or press release, that I believe are most indicative of my client's true character.

### Mr. Mullins' Continued Care for his Mother

Mr. Mullins' mother, Carmen, is 94 years old, and resides in a nursing home near Mr. Mullins' home in Port Washington.  Carmen had previously resided with Mr. Mullins, with the assistance of a home health aide, since suffering a stroke 8 years ago.  Mr. Mullins has a close "loving relationship with his mother" (PSR ¶ 51).  He visits her daily, providing her affection, along with meals and comfort items.   He also manages her medical decisions and oversees her finances. Mr. Mullins' one surviving brother resides in Florida and is mostly estranged from the family.  Mr. Mullins dreads the devastating impact his incarceration would have on his ability to attend to his mother.

### The Focus Forward Project

Earlier this year, Mr. Mullins was offered the opportunity to participate in the Focus Forward Project ("FFP") on the recommendation of his Pretrial Service Officer, Kristina De Primo. Neither I nor Mr. Mullins were familiar with FFP and were unaware that there was a sentencing advocacy component to it.  After Mr. Mullins undertook the program, the Court, without objection from the Government, agreed to adjourn sentencing to allow him to complete the 14-week curriculum.

Late last month I had the privilege of attending Mr. Mullins' graduation at the Church of the Ascension, where he was asked to be a class speaker.  It was truly something to see the humility with which he addressed the room and the inspirational message he delivered.  He spoke not of himself and instead used his time to acknowledge and encourage his program peers.  Although his fellow graduates came from contrasting social, economic, and racial backgrounds, Mr. Mullins presented in every way as their equal.

Mr. Mullins' class facilitators have submitted a letter on his behalf. They recount how he "immersed" himself in the curriculum and "consistently expressed deep remorse" for the pain he has caused (see, "**Exhibit B**", letter from the Focus Forward Project). The facilitators also remarked on the "empathy" he showed toward his fellow classmates and the "quiet humility" with which "he offered them consoling and constructive advice", hearing what others had to say, "rather than insisting on his own views." The FFP Executive Director, Pamela Miller, was also impressed with Ed's commitment to the program and is planning to speak on his behalf at sentencing.

<u>Probation's Recommendation of a Below Guideline Sentence</u>

Following Mr. Mullins' guilty plea, the United States Probation Office ("USPO") conducted a thorough presentence investigation. The PSR recounts the factual history of Mr. Mullins' offense and corroborates much of Mr. Mullins' family, education, health and employment history. The PSR also confirms that Mr. Mullins has been fully compliant with his pretrial supervision.

Probation Officer Jemmard Thomas submitted an addendum and sentencing recommendation to the PSR wherein the USPO recommends the Court consider a variance, pursuant to 18 U.S.C § 3553(a), and impose a below guidelines sentence of 24 months imprisonment (see, PSR at P. 20-22). While acknowledging the seriousness of the offense, the USPO points to several mitigating factors in Mr. Mullins' favor, including his "family ties, his 39 years of service as a New York City Police Officer, and his compliance with bail conditions", along with his lack of criminal history, suggesting a low risk of recidivism (see, PSR at P. 21).

<u>Application of the 3553(a) Factors in Support of a Below Guidelines Sentence</u>

On January 12, 2005, the Supreme Court ruled in *U.S. v. Booker*, 543 U.S. 220 (2005) that the mandatory application of the federal sentencing guidelines violated the right to trial by jury under the Sixth Amendment. The Court remedied the Sixth Amendment violation by excising the provisions in the Sentencing Reform Act that made the federal sentencing guidelines mandatory, thereby converting the mandatory system that had existed for almost 20 years into an advisory one. Subsequent to *Booker,* sentencing courts are permitted to look outside the framework of the guidelines in U.S.S.G. § 5K, and the enumerated "Departures", and determine if there are grounds for a downward variance from the calculated sentencing guideline range.

Turning from the power and authority of the once "mandatory" United States Sentencing Guidelines, the Courts are redirected to look back at the primary sentencing mandate of 18 U.S.C. § 3553(a), "Factors to be considered in imposing a sentence," which in effect states the Courts must impose a minimally sufficient sentence that is sufficient, but not greater than what is necessary to achieve the statutory purposes of punishment—justice, deterrence, public protection, and rehabilitation. Furthermore, the Courts should recognize in determining the type and length of sentence that should be imposed, that "imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a). "It is the sentencing court's prerogative-indeed its duty-to 'draw upon [its] familiarity with a case, weigh the factors enumerated in [section] 3553(a), and custom-tailor and appropriate sentence.'" *Unites States v. Ortiz-Perez*, 30 F.4th107, 112 (1st Cir 2022) (alterations in original) (quoting *Unites States v. Flores-Machciote*, 706 F.3d 16, 20 (1st Cir 2013)).

*Grounds for Downward Variance*

Pursuant to 18 U.S.C. § 3553, "Imposition of Sentence," the Court "shall impose a sentence sufficient, but not greater than necessary, to comply with the following purposes of sentencing" and "in determining a particular sentence to be imposed," consider the following:

1. The nature and circumstances of the offense and the history and characteristics of the defendant;
2. The need for the sentence imposed-
   a. to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment for the offense;
   b. to afford adequate deterrence to criminal conduct;
   c. to protect the public from further crimes of the defendant;
   d. to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in a most effective manner;
3. The kinds of sentences available;
4. The kinds of sentences and the sentencing range established.

Based on the analysis of these factors below, the defense submits that a below guidelines sentence is appropriate in Mr. Mullins' case.

**The nature and circumstances of the offense and the history and characteristics of the defendant:** Mr. Mullins has not sought to minimize his criminal conduct. He knowingly stole from the SBA and used his prestigious position to conceal that theft. He is ashamed of his actions and has accepted responsibility for his conduct. Yet, Mr. Mullins has otherwise led a law-abiding life aside from this incident; one devoted to public service. His many good acts are documented in the numerous letters provided to this Honorable Court (see, "**Exhibit A**", letters of support).

**The need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense:** Mr. Mullins has already paid a tremendous price for his conduct. An individual, often known for his brash bombast, has been shamed in the media and very publicly humbled. Mr. Mullins seeks no sympathy in this regard. He realizes it is his actions that have brought shame onto himself and his family and have let his critics have the last word.

Mr. Mullins will also pay a very heavy financial cost for his crime. The plea agreement includes $600,000 in mandatory restitution, along with a consent order of forfeiture for another $600,000. This represents double the proceeds of Mr. Mullins' crime, and nearly twice his total net worth. The Government began garnishing 25% of NYC pension shortly after his guilty plea and have obtained writs restraining most of his other assets. While the undersigned has advocated to have the restitution order satisfied through forfeiture via the restoration process (see, "**Exhibit C**", copy of Defense Counsel's letter mailed to AUSAs), the Government has thus far been unamenable and Mr. Mullins stands to lose his home and his retirement savings as a result. As evidenced by his financial information detailed in the PSR, Mr. Mullins was already struggling to meet his monthly expenses, and now finds himself falling behind with the imposition of the Government's wage garnishment.

5

Aside from the direct financial impact of his conviction, there is also the lost earning capacity resulting from Mr. Mullins' misconduct.  Whereas someone of his stature would ordinarily have a wealth of well-paying opportunities upon retirement, Mr. Mullins instead finds himself delivering used cars for an hourly wage.  While he hopes to utilize his education and increase his earnings upon concluding his sentence, he will never again work in law enforcement or be able to pursue the array of opportunities that would otherwise have been available to him absent this conviction.

Mr. Mullins' ability to realize his earning potential will be further curtailed by any carceral sentence, whereas a non-custodial sentence, with a term of community supervision, would permit Mr. Mullins to earn income above his monthly pension, and accelerate his ability to make the SBA whole.  Such a sentence would still reflect the seriousness of the offense, promote respect for the law, and provide just punishment.

**The need for the sentence imposed to afford adequate deterrence to criminal conduct:** Warren Buffet once remarked that "it takes 20 years to build a reputation and five minutes to lose it."  For Mr. Mullins, his reputation was built over four decades of hard work and perseverance, wherein he elevated himself from street cop to decorated detective and ultimately head of one of the nation's largest police unions. This reputation is attested to by the many law enforcement members who have submitted letters asking that he receive leniency, despite expressing their disappointment with his betrayal.  While Mr. Mullins' public persona was not endearing to all, he was revered within law enforcement circles as someone who would go to the mat for his members.

While Mr. Mullins' graft was carried out over several years, his standing within the law enforcement community vanished in an instant.  For someone less devoted to their careers, the reputational harm might pale against the more tangible consequences of this conviction.  For Mr. Mullins, however, whose entire adult life was defined by law enforcement, it is devastating.  As a result, the consequences go well beyond public scorn.  Mr. Mullins thrived on the culture, the associations, and the fraternity of his fellow officers.   Instead of staying enmeshed in this world in retirement, he finds himself ostracized from it.  This constitutes a profound loss for Mr. Mullins that will endure for the rest of his life.

While the reputational impact of this conviction will serve to deter Mr. Mullins, it can also further the purpose of general deterrence, as his very public downfall, and resulting ostracism, is likely to discourage other prominent figures from engaging in similar graft.   This is in addition to the deterrent impact of the restitution and forfeiture orders, which have been already reported in the media.

**The need for the sentence imposed to protect the public from further crimes of the defendant:** Mr. Mullins' elevated position within the SBA allowed him to carry out this crime.  Indeed, the extent to which that position of trust facilitated and concealed his theft is underscored by the U.S.S.G § 3B1.3 enhancement included in the plea agreement.  Mr. Mullins is now retired from the NYPD.  His age and this conviction make him unemployable in the public sector.  Whether any other opportunities may arise; it is almost certain he will never occupy a position of trust resembling that which he had with the SBA.  Aside from this incident, Mr. Mullins has lived

6

a law-abiding life, and an extraordinarily productive one.  This crime was an aberration for him, borne out of desperation and greed, and facilitated by opportunity; an opportunity which no longer exists for Mr. Mullins and likely never will again.

Protection of the public from further crimes by Mr. Mullins can be achieved by a non-incarceratory sentence that incorporates special conditions of community supervision specifically fashioned by this Court.  The United States Probation Service is technologically resourced and well-equipped to protect the public by monitoring offenders in the community who have been convicted of financial crimes.

**The need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in a most effective manner:** While Mr. Mullins is not in need of educational or vocational training; he considers himself a lifelong learner and is willing to avail himself of any such programs, as witnessed by his success in the Focus Forward Project.  Mr. Mullins does have a litany of health conditions, several of which have been certified by the WTC Health Program as stemming from his post 9/11 service. These include: Irritant Induced Nasal Inflammation or Rhinitis/Sinusitis; Reactive Airway Dysfunction Syndrome (RADS) or Asthma (PSR ¶ 61); Gastroesophageal Disease (GERD (PSR ¶ 62)); Sleep Apnea; and Malignancy Basal Cell Carcinoma.  Mr. Mullins has also been treating for several years at St. Francis Hospital and Heart Center in Roslyn for a variety of significant cardiac issues, including Arrhythmia, Massive Pulmonary Embolisms, and Pericarditis (PSR ¶ 60). In addition, Mr. Mullins is currently treating with Dr. Ricky Madhok for a herniated disc, and is being evaluated for S1 L5 lower back fusion surgery.  Mr. Mullins previously underwent a double fusion spinal surgery with Dr. Madhok in 2020; a double cervical at NYU Hospital in 2015; hernia surgery with Dr. Reiner at Mt. Sinai Hospital in 2012; a spinal laminectomy with Dr. Richard Johnson at St. Francis Hospital in 2012 (PSR ¶ 63); as well as surgery to remove skin cancer cells connected to 9/11 that same year.   As a result of his numerous back surgeries, he has reduced mobility and suffers from stiffness and ongoing backpain (PSR ¶ 63).

Although the United States Bureau of Prisons is a well-managed institution with adequate medical facilities, it is unlikely Mr. Mullins would receive the level of care provided by his own doctors if sentenced to a period of incarceration.  Moreover, his breathing, sleep and pain management issues are all likely to be aggravated in a harsh prison environment.   Mr. Mullins does not suggest his physical ailments warrant sympathy.  However, the level of care his maladies require, and the increased risk associated with them, are proper factors for this Court to consider in fashioning an appropriate sentence under 18 U.S.C. § 3553(2)(D).

**The kinds of sentences available and the sentencing range established:**  As indicated in the PSR, the sentencing guideline range established by the U.S.S.Gs is 33 to 41 months.  Because Mr. Mullins falls within Zone D of the sentencing table, he is ineligible for probation under the guidelines.  However, pursuant to 18 U.S.C. §1343, he can be sentenced statutorily to anywhere between 0 to 20 years in custody.   In addition, in lieu of a custodial sentence, this Court is statutorily authorized to impose a probation sentence (PSR ¶ 84) of between one and five years (18 U.S.C. § 3561(c)(1)).  The guideline range in this case invites this Court to impose a sentence which varies below the 33-to-41-month range recommended by the guidelines.  A downward variance would be consistent with the recommendation of the United States Probation Office,

which is included in the PSR addendum (see, PSR at P. 20).  While the sentence recommended by Probation still calls for a period on incarceration, we urge the Court, considering the compelling factors in mitigation addressed herein, to exercise its discretion to impose a non-custodial sentence, which can be achieved in one of two ways:  1) A sentence to time served with a period of supervised release; or 2) a sentence to probation.  Either of these options can include special conditions fashioned to protect the community and ensure compliance.

<u>Non-Incarceratory Sentences in Fraud, Theft & Embezzlement Cases & the Prevalence of Downward Variances in the Second Circuit</u>

According to statistics published by the United States Sentencing Commission, variances were granted in 55.1% of cases last year in the Second Circuit.  41.8% of these were non-Government sponsored downward variances. See *USSG Statistical Information Packet, Fiscal Year 2022, Second Circuit,* Table 8, p. 12, www.ussc.gov.  The New York Southern District led the way with 69.8% of sentences varying outside the guideline range. *Id.* at Table 9, P.13.  Meanwhile, variances were granted in 59.4% of fraud, theft, and embezzlement cases in the Second Circuit, and only 22.3% of such sentences were imposed within the guidelines range.

While most fraud, theft, and embezzlement cases in the Second Circuit resulted in prison only sentences (74.3%), the Courts did impose a sentence of prison and alternatives, or a non-incarceratory sentence in in over 25% of cases. *Id.,* Table 5, P. 9.  The mean sentence for fraud, theft, and embezzlement cases in this circuit was 20 months. *Id.* at Table 7, P. 11.

Based on the foregoing statistics, a below guidelines sentence for a case such as Mr. Mullins' case is not unusual, it is actually quite common; whereas a non-incarceratory sentence, while statistically less common, still occurs with some frequency in this Circuit and beyond.

In *People v. Musgrave*, 647 Fed.Appx 529 (6th Cir. 2016), where the defendant was convicted at trial of numerous crimes, including wire and bank fraud, the Court affirmed the District Court's decision to vary downward from a guidelines range of 57-71 months, and impose a sentence of three years supervised release with home confinement.  In *Musgrave,* the Appellate Court cited to the District Court's reliance on *Gall v. United States,* 552 U.S 38, and its acknowledgment that sentences of probation and supervised release constitute "substantial restrictions" on an individual's liberty and can aptly satisfy the goals of general deterrence. *Id.* at 532-533.  The Court agreed with the District Court's assessment that "[t]here is no justice in imposing a sentence merely to make an example out of a defendant" and held that other 3553(a) factors must be considered, "including the particular circumstances of the defendant and the crime, [b]ecause the punishment should fit the offender and not merely the crime." *Id.* at 533, quoting *Williams v. New York*, 337 U.S 241, 247.

*Musgrave* also cited the substantial financial consequences attendant the defendant's sentence, in terms of both the fine and the restitution order imposed.  As to the latter, *Musgrave* cited the District Court observation that the goal of obtaining restitution for the defendant was "best served by a non-incarcerated and employed defendant," while acknowledging the "statutory requirement in imposing sentence to consider the need to provide restitution to any victim of the offense." *Id.* at 536.  This seems particularly apt to Mr. Mullins' case given the financial impact of both the restitution and forfeiture order set forth in his plea agreement.

This Court itself has seen fit to vary below the sentencing guidelines in fraud and embezzlement cases.  In *King v. United States*, 2017 WL 1483337 (SDNY 2017), the petitioner had plead guilty to embezzling from an employer benefits plan (18 U.S.C §§ 664) and subscribing to a false United States individual tax return (26 U.S.C § 7206(1), with a stipulated loss amount of $7 million.  *Id.* at 6.  Despite finding that the petitioner "had failed to accept responsibility or express remorse for her actions" and "had instead sought to blame numerous other parties," the Court nonetheless varied downwardly and imposed a sentence substantially below the minimum term stated in the guidelines. *Id.* at 8.  While the facts of each case are of course different, we hope this Court can see its way to a downward variance given what we submit are the substantial factors in mitigation set forth in this sentencing submission.

<u>Conclusion</u>

Mr. Mullins' conviction has forever sullied an otherwise storied law enforcement career. It is a painful reality that Mr. Mullins will live with for the rest of his life, regardless of the sentence imposed.  He understands that regardless of the personal shame he must live with, the ends of justice must be served.  Yet we believe those ends can be met with a non-custodial sentence.  Mr. Mullins has seen the error of his ways and has already paid dearly for his transgressions.  A sentence void of any type of custodial component yet containing a period of community supervision with special conditions, would be sufficient, but not greater than necessary, to comply with the purposes of sentencing as dictated by Congress and set out in 18 U.S.C. § 3553.

Mr. Mullins realizes that it is not some unfortunate happenstance that brings him before this Court.  On the contrary, this is a calamity of his own making.  Yet, as Mr. Mullins impressed upon his fellow graduates of the Focus Forward Project, "the comeback" can be "greater than the setback."  We ask for Your Honor's leniency in fashioning an appropriate sentence that will achieve the goals of sentencing, while affording Mr. Mullins the opportunity to begin his comeback.

Respectfully submitted,

*Thomas A. Kenniff*

Thomas A. Kenniff


Cc: AUSA Alexandra Rothman (via ECF/Email: Alexandra.Rothman@usdoj.gov)
    AUSA Melissa Childs (via ECF/Email: melissa.childs@usdoj.gov)