

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 26, 2023

**BY ECF**

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    *United States v. Edward Mullins*, 22 Cr. 120 (JGK)

Dear Judge Koeltl:

    The Government respectfully submits this letter in connection with the sentencing of defendant Edward Mullins ("Mullins" or the "defendant"), scheduled for Thursday, August 3, 2023, at 11:30 a.m.

    Motivated by greed and emboldened by power, the defendant—an NYPD sergeant and the President of the Sergeants Benevolent Association ("SBA")—orchestrated a multi-year scheme in which he submitted false and inflated expense reports to the SBA for personal reimbursement. Mullins used these stolen funds—nearly all of which came from SBA members' dues—to pay for a lavish lifestyle of gourmet meals and designer items, including jewelry, clothing and electronics. Mullins submitted more than one hundred fraudulent expense reports to the SBA and received more than $1 million dollars in reimbursement checks. In doing so, Mullins brazenly stole from the same dues-paying members of the SBA that he had pledged to protect.

    As set forth below, the Government submits that a sentence of 41 months' imprisonment, which is a sentence at the top of the Stipulated Guidelines Range, is sufficient but not greater than necessary to serve the legitimate purposes of sentencing. The defendant, a public official, abused the position of trust that he had occupied as the President of the SBA for almost two decades and selfishly stole hundreds of thousands of dollars for his own personal gain. While the Government recognizes that the defendant has spent years in public service and has no prior criminal history, the Section 3553(a) factors, and specifically, the nature and circumstances of the offense, the need to afford adequate deterrence to criminal conduct, and the need for the sentence to promote respect for the law and to provide just punishment for the offense, plainly justify a sentence of 41 months' imprisonment in this case.

I.  **Factual Background**

This case involves a scheme by Edward Mullins to steal hundreds of thousands of dollars from the same union members that he was entrusted to represent and whom he frequently publicly claimed to support.

From 2002 until October 2021, when agents with the Federal Bureau of Investigation ("FBI") executed search warrants at Mullins's home and the SBA headquarters in lower Manhattan, Mullins served as President of the SBA. PSR ¶ 15. As an NYPD Sergeant and SBA President, Mullins received a salary of approximately $133,000 each year from the NYPD,[1] and also received an SBA annual stipend of roughly $90,000.

The SBA's membership consists of all active and retired NYPD sergeants. PSR ¶ 8. It is the fifth-largest police union in the United States, and as of October 2021, had 13,000 members. PSR ¶ 8. The purpose of the SBA is to "promote the general welfare of its membership through moral, intellectual, and social cooperation." PSR ¶ 9. Among other things, the SBA hosts social events for its members, provides support to members, and their families, in times of need, and manages the health insurance, prescription benefits and annuity plans for current and retired members.

All SBA members are required to pay membership dues to the SBA, with payments deposited into the SBA's Contingent Fund, or operating budget. PSR ¶ 10. For active members, dues are approximately $1,300 each year. Retired members pay a one-time fee of $600. PSR ¶ 10. The SBA's Constitution makes clear that the Contingent Fund is to be used for "regular, fiscal, and miscellaneous expenses necessary for the transaction of the [SBA's] business." PSR ¶ 11. Moreover, while the President of the SBA may use the Contingent Fund for "travel, lodging, meals, et. cetera," those expenses must be "incurred in the performance of duties" of the SBA. PSR ¶ 12. Put differently, the SBA President cannot use the Contingent Fund to fund his personal expenses unrelated to his work at the SBA.

To ensure compliance with these rules, the SBA had a written expense reimbursement policy, which required, among other things, SBA officers to submit receipts to the SBA Treasurer to obtain reimbursement for their expenses. PSR ¶ 13. Absent a receipt, and without any explanation as to why no receipt was provided, the Treasurer was not authorized to process and approve any expenses. PSR ¶ 13.

Beginning in late 2017 and continuing until October 2021, Mullins ignored these rules and treated the SBA's Contingent Fund as his personal piggy bank. Typically bi-weekly, but sometimes more frequently, Mullins would prepare fraudulent expense reports and email the reports to the SBA Treasurer. These expense reports largely listed expenses for Mullins's purported SBA-related meals at restaurants and travel. Mullins rarely, if ever, included receipts with his expense reports. The Treasurer processed the expense reports and issued Mullins reimbursement checks, which were drawn from the SBA's Contingent Fund.

---

[1] https://www.seethroughny.net/payrolls (last accessed July 26, 2023)

Mullins's expense reports were fraudulent in at least three ways:

*First*, Mullins included meals on his expense reports that were not SBA-related. PSR ¶ 22. Mullins would routinely purchase dinner for himself and his family members and then submit those expenses to the SBA, thereby stealing from the SBA. PSR ¶ 22. On at least one occasion, Mullins purchased $600 in gift cards for use at an expensive restaurant in Manhattan – where the prix fixe menu cost at least $150 per person – expensed those gift cards to the SBA, and then gave the gift cards to family members to use.

*Second*, Mullins inflated the costs of meals – whether SBA-related or not – thereby taking more money from the SBA. For instance, if the actual cost of a meal was $522.55, Mullins would seek reimbursement for that meal for $822.55, and pocket the difference. PSR ¶ 23. Mullins used this stolen money to cover other personal expenses on his credit card statements, including luxury items at Tiffany & Co. and Hermes, as well as college tuition for a family member.

*Third*, Mullins would take certain expenses from his credit card statements, including clothing and supermarket expenses, and recategorize them as SBA-related meals on his expense reports, thereby obtaining additional money from the SBA. PSR ¶ 24. For example, during a trip to Las Vegas for a law enforcement conference, Mullins spent $2,383 at a hotel clothing store. Rather than pay for that clothing himself, Mullins expensed the same amount on his SBA expense report as "Entertainment." Mullins did the same during another trip to Las Vegas, when he spent $1,148 for several clothing items at the same hotel, and expensed that charge to the SBA as a "Meal" on an expense report.

To implement this scheme, the defendant maintained two copies of his credit card statements in his home office in Long Island, which was one of the two locations FBI agents searched in October 2021. PSR ¶ 25. The first copy, often labeled with a sticky note bearing the words "Clean Copy," had no annotations or markings. PSR ¶ 25. The second copy, often labeled with a sticky note bearing the words "Work Copy" or "Work Sheet," had Mullins' handwritten annotations and markings throughout. PSR ¶ 25. In the Work Copy, the defendant changed the amount and, at times, the type of expense, from a lower amount to a larger amount, or from an item that could not be reimbursed – such as a supermarket bill – to a restaurant name, which would then be reflected in the expense reports that Mullins submitted to the SBA. PSR ¶ 25.

Examples of some of the defendant's annotated Work Copies of his credit card statements are included on the following page:

[Image of two columns of dollar-amount entries with handwritten annotations and yellow highlighting; left column: $45.92, $609.89, $50.42, $146.56, $90.00, $2.99, $72.77, $62.76, $25.00, $172.60, $106.68, $185.88 (annotated 1085.88); right column: $49.60 (89.60), $53.56 (153.56), $64.99, $12.98, $74.97, $370.40, $50.25, $16.03, $96.16 (396.16), $98.49, $228.92, $152.42 (352.Y8), $464.00 (669.00)]

Mullins became increasingly brazen over time and stole greater sums of money from the SBA. For instance, in 2017, the defendant received $69,655 in expense reimbursements from the SBA. PSR ¶ 21. In 2018, this amount grew to $265,465. PSR ¶ 21. In 2019, this amount grew to $344,909. PSR ¶ 21. In 2020, during the peak of the Covid-19 pandemic, the defendant received $174,114 in expense reimbursements from the SBA. PSR ¶ 21. Finally, up and until October 2021, when the FBI executed its searches and the defendant resigned from the SBA, the defendant received $153,836 in expense reimbursements from the SBA. PSR ¶ 21.

## II. Procedural History, Guidelines and PSR

On October 5, 2021, FBI agents obtained and executed search warrants at the SBA headquarters in lower Manhattan and at Mullins's home in Long Island. Five months later, on February 23, 2022, Mullins agreed to waive Indictment and was arraigned on a felony Information, 22 Cr. 120 (JGK) (the "Information"), which charged him with one count of wire fraud. Mullins entered a plea of not guilty at that time. PSR ¶ 28.

Almost one year later, on January 19, 2023, Mullins returned to court and pled guilty to the Information pursuant to a plea agreement with the Government. PSR ¶ 4. At the time of his guilty plea, Mullins admitted the following:

> Beginning in late 2017, while I was serving as president of the NYPD Sergeants Benevolent Association, I submitted false and inflated expense reports to the SBA for reimbursement. I did this by inflating the cost of meals and related expenses on my expense reports and by taking unrelated personal expenses and represented them as SBA-related expenses. I submitted many of these —[] expense reports via email and deposited some of the inflated reimbursement checks at local bank branches here in Manhattan. I did this with the purpose of obtaining money from the SBA Contingent Fund that I was not entitled to.

PSR ¶ 32.

The Plea Agreement calculated the adjusted offense level as 20 and the Criminal History Category of I, resulting in a Stipulated Guidelines Range of 33 to 41 months' imprisonment. In addition, as part of his guilty plea, the defendant agreed to make restitution to the SBA in the amount of $600,000, and also agreed to forfeit $600,000, as proceeds of his crimes.

On April 12, 2023, the Probation Department issued its Presentence Investigation Report (the "PSR"), which likewise calculates the Guidelines as 33 to 41 months' imprisonment. PSR ¶¶ 33-46, 79. Probation recommends a downward variance to 24 months' imprisonment, citing to "potential mitigating factors" such as the defendant's "family ties, his 39 years of service as an [NYPD] Officer, and his compliance with his bail conditions." PSR at 21.

With respect to the Guidelines calculation, the Government notes that the anticipated Guidelines amendment in November 2023 will provide a two-level decrease for certain zero-point offenders under a new U.S.S.G. § 4C1.1. A two-level offense level reduction would be warranted for Mullins under the proposed new Section 4C1.1 of the November 2023 version of the Sentencing Guidelines manual if it were in effect today. Accordingly, the Government has no objection to the Court calculating the Guidelines as offense level 18 and Criminal History I, resulting in a guidelines range of 27 to 33 months' imprisonment. However, notwithstanding any reduction in the Guidelines, and as explained below, the Court should impose a sentence of 41 months' imprisonment, which is within the Stipulated Guidelines Range of the Plea Agreement, in light of the Section 3553(a) factors.

**III.   A Sentence Of 41 Months' Imprisonment Is Justified In This Case**

    **A.   Applicable Law**

The Sentencing Guidelines provide strong guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49. After that calculation, however, a court must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence imposed to promote respect for the law, to provide just punishment for the offense, to adequately deter criminal conduct, and to protect the public from further crimes of the defendant. *See* 18 U.S.C. § 3553(a).

    **B.   Discussion**

In this case, a sentence of 41 months' imprisonment is sufficient but not greater than necessary to achieve the purposes of sentencing, as set forth in 18 U.S.C. § 3553(a). In making this recommendation, the Government has carefully considered all of the facts and circumstances of this case, including the mitigating factors set forth in the defendant's sentencing submission, such as his approximately 39 years of public service as a member of the NYPD. However, the defendant's steady accumulation of power within the NYPD, coupled with his public-facing

support for the hard-working NYPD sergeants he was entrusted to protect, is what made his conduct in this case so egregious.

As described below, the Section 3553(a) factors weigh heavily in favor of a 41-month sentence. The most salient factors here are the nature and seriousness of the offense; the need for the sentence imposed to afford adequate deterrence; and the need to provide just punishment for the offense and to promote respect for the law.

*i. The Need For the Sentence to Reflect the Nature and Seriousness Of the Offense*

Section 3553(a) provides that the sentence imposed should reflect the nature and seriousness of the offense. 18 U.S.C. §§ 3553(a)(1), (a)(2)(A). Here, as described above and in the PSR in detail, the defendant's offense was extremely serious.

The defendant served as President of the SBA for nearly two decades. He won re-election four separate times during that span, vowing to protect and look out for the interests of the thousands of active and retired NYPD sergeants that he represented. It was the defendant's duty to defend and advocate for these NYPD sergeants, and he became well-known within New York City for his public comments in support of the NYPD. Behind the scenes, however, the defendant stole from the SBA and its members for years, pocketing over $1 million in purported expense reimbursements, the vast majority of which were fraudulent.

The dollars the SBA amassed in its Contingent Fund – which came from the paychecks of hard-working NYPD sergeants – should have been used to advance the mission of the SBA, including to pay for SBA-related events and services. Instead, due to the defendant's greed, hundreds of thousands of dollars of those dues paid for fancy meals and designer items that the defendant personally enjoyed, and which had nothing to do with his work at the SBA.

Any fraud scheme of this length and magnitude is serious and justifies a lengthy term of imprisonment, but the defendant's actions, when considered within the context of his leadership position at the SBA, are particularly aggravating. Instead of submitting receipts with his reimbursements, which was required by the SBA in order to process SBA-related expenses, the defendant kept his receipts at home and doctored them by hand to keep track of his fraud. Each fraudulent expense was carefully documented in a "clean" and "work" copy of the defendant's credit card statements. The annotations that the defendant made on those statements—including adding hundreds of dollars to mundane, unrelated expenses and then passing them off as legitimate SBA-related expenses—demonstrates the complete disregard that the defendant had for the fact that he was plundering dues paid by the members of the union he was entrusted to protect. Because of the defendant's position of power and trust within the SBA, and his reputation as an outspoken advocate for the NYPD, his reimbursement requests were processed without question, allowing him to engage in this conduct unabated for years. There is simply no way to downplay the significant abuse of trust that the defendant engaged in to perpetuate his fraud.

Notably, the defendant's conduct was not a momentary lapse in judgment. Rather, over the course of approximately four years, he submitted to the SBA more than one hundred fraudulent expense reports, each of which contained dozens of individual expenses that were fraudulent in

nature. The defendant's scheme was calculated and deliberate; he doctored his credit card statements to reflect these increased expenses and then prepared fraudulent expense reports, which he submitted to the SBA Treasurer for reimbursement. By seeking reimbursement not only for actual expenses, but for expenses never incurred, the defendant dug deeper into the pockets of the SBA members to pay for his other living expenses—expenses he could not plausibly pass through the SBA reimbursement process, including college tuition for a family member and jewelry and other designer clothing. In total, as the parties have agreed, the defendant stole between $550,000 and $1,500,000 from the SBA, and the defendant has agreed to forfeit $600,000 in illegal proceeds to the United States, and to make restitution to the SBA in the amount of $600,000 as well.

In considering the serious nature of this offense, it is noteworthy that the defendant was not just the head of any union, he was a member of the NYPD and the head of a law enforcement officers' union. As a member of the NYPD, the defendant had a responsibility to protect the public and uphold the rule of law. His participation in this crime, which involved defrauding other officers and stealing hundreds of thousands of dollars, went against everything the defendant was supposed to uphold and the principles that the NYPD stands for. It was an example of precisely the type of conduct that can erode the public's faith in law enforcement, further underscoring the seriousness of this offense. Such serious conduct must be met with serious consequences, which the Government respectfully submits should be a 41-month sentence.

### ii. *The Need to Afford Adequate Deterrence to Criminal Conduct*

Section 3553(a)(2)(B) provides that the Court, in imposing sentence, should consider the need to afford adequate deterrence to criminal conduct. 18 U.S.C. § 3553(a)(2)(B). This factor also weighs heavily in favor of a sentence of 41 months' imprisonment.

The need for general deterrence, a factor the defendant largely sidesteps in his sentencing submission, is paramount here and strongly weighs in favor of a 41-month sentence. *See* 18 U.S.C. § 3553(a)(2)(B). Fraud schemes, particularly those involving the theft of union funds, are difficult to detect or to uncover their full scope. That is particularly true in a case such as this one, where the defendant's position of power within the union allowed him to engage in this criminal conduct unabated, with no concern that he would eventually be caught for stealing from the dues-paying union members that he represented. When such a scheme is successfully identified and prosecuted, a substantial sentence is warranted. *See, e.g.*, *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (internal quotation marks omitted)); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white collar crime is "of central concern to Congress"). The defendant's conduct here is a powerful reminder of the need for general deterrence, and a message must be sent to other would-be corrupt officials that their actions will have significant consequences.

Sentencing the defendant to no jail time would send precisely the opposite message: that the defendant got a pass, and other powerful would-be defendants will too. If the Court were to

grant the defendant's request for a non-custodial sentence, or impose a sentence below the applicable Guidelines range, it would send a very clear and regrettable message to the labor community, and New York City generally, that this sort of criminal conduct will be treated with leniency and can result in little to no prison time, regardless of whether the crime involved an abuse of trust and the theft of hundreds of thousands of union members' money over the course of years. That simply cannot be the message, particularly in a case such as this, where the outcome undoubtedly will be made known publicly and within the labor and law enforcement communities. A sentence at the top of the Guidelines would send an important message to fiduciaries that legal, professional, and law enforcement responsibilities and obligations take precedence over economic opportunities, regardless of circumstance.

Moreover, a sentence of 41 months' imprisonment would send a powerful message that no one, not even well-known law enforcement officers in high-ranking positions, are above the law, and that those who abuse their law enforcement positions to commit crime will suffer serious consequences. Indeed, at a time when the public's trust in law enforcement has been called into question, there is a real need to send a message that those who engage in conduct that undermines that trust will be held accountable to the full extent of the law. A sentence of 41 months' imprisonment would serve to achieve that goal and aim to deter any other law enforcement officers who may consider engaging in such conduct.

Finally, it is apparent from the letters of support submitted with the defendant's sentencing submission that the defendant had connections, advantages, and a familial and professional support system which many, indeed, most, others who appear before the Court do not. He had ample opportunity to avoid engaging in criminal conduct, but did so anyway out of greed, abusing his position of trust within law enforcement in the process. And while the defendant's submission recognizes that he received several awards for his service to the NYPD and the community, it fails to acknowledge the irony of his having received these types of awards and recognitions, yet stole hundreds of thousands of dollars from his fellow law enforcement officers. This type of duplicitous illegal behavior cannot be tolerated. The Court's sentence should thus send a deterrent message to others who may be tempted to take advantage of what and who they know, or the position they are entrusted with, to do the same.

      iii.     *The Need to Impose Just Punishment and Promote Respect for the Law*

Section 3553(a)(2)(A) provides that the Court must consider the need for a sentence to "provide just punishment for the offense" and promote respect for the law. 18 U.S.C. § 3553(a)(2)(A). In this regard, a sentence of 41 months' imprisonment is critical.

As described above, the defendant was a NYPD Sergeant responsible for upholding the laws in New York. Despite this, he brazenly and selfishly broke the law, and stole from the SBA. This type of corruption and fraud, which demonstrates a clear abuse of power and an utter disregard for the rule of law, must be met with significant punishment to promote respect for the law and to provide just punishment for the offense.

As a member of the NYPD and President of the SBA, the defendant was entrusted with power and authority. That power and authority flowed from the trust of other NYPD and SBA members, as well as the public, and was supposed to be used for good: to help the SBA advance

its mission. By abusing his position to line his own pockets, the defendant took actions that could significantly undermine the public's trust in law enforcement, and betrayed the trust that members of the SBA had in the defendant. The defendant stole hundreds of thousands of dollars from the SBA and did so by relying on the power he wielded within the SBA to ensure that no one questioned the actions he took to steal SBA members' dues. The Stipulated Guidelines Range takes those factors into account. *See* PSR ¶¶ 35, 37. What the Guidelines do not account for, however, is the fact that the defendant's fraud was not a one-time occurrence: he carried out his brazen fraud scheme over the course of four years, repeatedly and deliberately submitting fraudulent expense reimbursement requests to the SBA. This aggravating factor, coupled with the defendant's abuse of trust, the significant amount of money he stole, and the other Section 3553(a) factors addressed herein, justifies a sentence of 41 months' imprisonment.

More generally, crimes like those the defendant committed are corrosive to trust and integrity, breeding cynicism and mistrust—about unions, about officials in positions of power, about law enforcement, and about commitment to the common good. Such cynicism and mistrust causes real harm, impairing unions' and law enforcement's abilities to serve their important public role. The defendant did not care about that and thought he could get away with his crimes for years. In doing so, the defendant flouted the rule of law. Indeed, while the defendant publicly touted his support for the thousands of union members he represented, he secretly plundered their hard-earned money on luxury goods and lavish dinners. The defendant should be punished accordingly to promote respect for the law. It is critical that public officials who engage in criminal conduct are held accountable to the fullest extent in order to show that those who commit crimes, no matter who they are or what position they hold, will face serious consequences for breaking the law. A sentence of 41 months' imprisonment would serve that purpose.

### IV.     The Defendant's Request for a Non-Incarceratory Sentence Should Be Rejected

The defendant asks this Court to impose a non-incarceratory sentence, relying principally on arguments about his personal history and years of public service; the financial impact of his conviction; the negative consequences to his reputation from his conviction; his successful completion of the Focus Forward Project; and the need to avoid unwarranted sentencing disparities among similarly situated defendants. *See* Dkt. 84. As set forth below, each of the defendant's arguments fails.

*First*, the defendant argues that his personal history and years of public service merit a non-incarceratory sentence. *See* Dkt. 84 at 1-3. This argument lacks merit. To start, while the defendant may have endured difficult and unfortunate circumstances in his home as a child, he has a college degree and a master's degree; owns his home in Long Island; and maintained steady employment with the NYPD for almost four decades prior to committing the instant offense. In fact, Mullins earned more than $220,000 each year from the NYPD and SBA, not including his fraudulent expense reimbursements. The PSR notes the substantial assets the defendant has acquired over the years and also notes that he has a net worth of over $370,000, an amount that far exceeds the net worth of many individuals that come before the Court and argue that financial circumstances led them to commit crime. Thus, while the defendant may have faced some financial struggles around the time of the instant offense, that is no excuse for his decision to engage in the charged crime. Rather, as seen by the items that Mullins chose to purchase with the

money he stole, including fancy meals and designer items, the defendant was largely motivated by personal greed and a desire to live a certain lifestyle.

The defendant also argues that an incarceratory sentence would impact not just him, but also his family. *See* Dkt. 84 at 3. To be sure, the Government recognizes that the defendant has the love and support of his family, and that any incarceratory sentence will impact his family. But that is the case for nearly all families with incarcerated loved ones. Perhaps for this reason, the Second Circuit has held that a defendant's "family ties . . . generally only justify a downward departure in 'unusual' or 'extraordinary' cases[.]" *United States v. Lyttle*, 460 F. App'x 3, 10 (2d Cir. 2012); *see also* U.S.S.G. § 5H1.6 ("In sentencing a defendant . . . family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted."). Furthermore, these unfortunate consequences of criminal conduct were entirely foreseeable to the defendant; no one else but the defendant made the choices that resulted in him facing a substantial term of incarceration.

The Government is also cognizant of the decades the defendant spent in public service and the many accolades he received over that time. While that is commendable, it was the defendant's position of power at the SBA acquired after years of service in the NYPD that allowed him to perpetuate his fraud unabated. The defendant argues that the reputation he built "over four decades of hard work and perseverance" at the NYPD "vanished in an instant" when his fraud was uncovered. *See* Dkt. 84 at 6. But as described above, it was the defendant's choice alone, motivated by greed, to betray the trust of the men and women in the NYPD that he vowed to protect by stealing from them for years. While the defendant may have spent years building a reputation as an outspoken supporter of the NYPD, he disgraced his uniform and broke the law by taking advantage of his position of power in order to steal from his fellow law enforcement officers. That is inexcusable.

*Second*, the defendant's arguments about the financial strain that he will face as a result of this case ring hollow. The defendant agreed to pay restitution and forfeiture in the amount of $600,000, based on the amount of money he stole from the SBA. In a case such as this, where the defendant spent years stealing money, the argument that he will not be able to pay back the victims of his crimes from jail should not sway the Court to impose a lesser incarceratory sentence. Indeed, this argument would apply to anyone facing incarceration who also is required to pay restitution and forfeiture. Therefore, while the Government recognizes that the defendant's ability to pay restitution and forfeiture on an accelerated timeline may be impacted by an incarceratory sentence, for all the reasons described above, a sentence at the top of the Stipulated Guidelines Range is still warranted.

*Third*, the defendant emphasizes the harm to his reputation that has flowed from his conviction, noting that he was often known for "his brash bombast" and now he "has been shamed in the media and very publicly humbled." Dkt. 84 at 5. This may be true, but it does not justify a non-incarceratory sentence or a downward variance. If anything, those with greater public footprints deserve lengthier, not shorter, prison terms. Such sentences have the potential to meaningfully deter other public figures from engaging in similar misconduct, and reiterate the important message that no one—not even powerful union bosses—are above the law.

*Fourth*, the defendant relies heavily on his successful completion of the Focus Forward Project as another reason for a downward variance. Without minimizing the value of this program to the many defendants in the District who take advantage of its offerings, the Court should not give much, if any, weight to the defendant's completion of this program in imposing sentence. By its own description, the program is designed, in part, to provide its participants with "transferable skills and tools, including [] a complete resume, interview practice, conflict resolution skills, and public speaking experience." Dkt. 84, Ex. B, at 2-3. But the defendant, a 39-year veteran of the NYPD who holds an advanced degree and is a charismatic public speaker, was already well-versed in the skills taught in the class. That the defendant became a "leader" in the class and even "represented [the] class by speaking at graduation" is hardly surprising. Dkt. 84, at 2-3. Public speaking and leading others is what the defendant does best, and in many ways, is what allowed him to fleece the SBA of hundreds of thousands of dollars. Thus, while the program itself is a wonderful resource for many defendants in this District, the defendant's completion of the program is largely a distraction.[2]

*Fifth*, the defendant argues that a non-incarceratory sentence would be in line with sentences imposed in similar cases. That is incorrect. The defendant himself acknowledges that almost 75% of cases involving fraud, theft, and embezzlement in the Second Circuit resulted in prison sentences. *See* Dkt. 84 at 8. Indeed, recent union cases involving fraud and corruption have resulted in terms of imprisonment in line with the 41-month sentence sought by the Government in this case. *See, e.g.*, *United States v. Fazzolari*, 17 Cr. 471 (AT), Dkt. 27 (S.D.N.Y. Jan. 30, 2019) (imposing a sentence of 37 months' imprisonment on a union president for his participation in, among other fraud-related crimes, embezzling more than $100,000 over at least four years, which he used on personal expenses); *United States v. Marie DeBoer*, 17 Cr. 105 (PLM), Dkt. 54 (W.D. Mich. Feb. 21, 2018) (imposing a sentence of 48 months' imprisonment on union bookkeeper who embezzled over $300,000 between 2012 and 2015 for unauthorized personal purchases and deposits); *United States v. Ventrone*, 17 Cr. 114 (MRH), Dkt. 49 (W.D. Pa. Feb. 22, 2018) (imposing a sentence of 41 months' imprisonment on union official who embezzled and evaded taxes on approximately $1,499,000 and used funds for personal purchases and shopping). A sentence at the top of the Guidelines in this case, which involves aggravating factors such as the defendant's significant abuse of a position of public trust, the high loss amount, and the defendant's repeated criminal conduct over the course of four years, would thus not result in unwarranted sentencing disparities, and instead, would be consistent with sentences imposed in similar cases.

The defendant cites to the sentence this Court imposed in *United States v. King*, 10 Cr. 122 (JGK), a case involving the embezzlement of millions of dollars, in support of a downward variance. *Id*. at 9. In doing so, the defendant fails to acknowledge that, while the Court found that a downward variance was appropriate in light of "significant mitigating factors in the case, most importantly related to the [defendant's] health," the Court still imposed a sentence of 72 months' imprisonment. *King v. United States*, 10 Cr. 122 (JGK), 2017 WL 1483337, at *8 (S.D.N.Y. Apr.

---

[2] The defendant indicates in his sentencing submission that Pamela Miller, the Executive Director of the Focus Forward Project, would like to speak on the defendant's behalf at sentencing. Dkt. 84, at 4. The Government opposes this request. Among other things, Ms. Miller has already conveyed her strong support for the defendant in her letter, which is attached to the defendant's sentencing submission as Exhibit B.

25, 2017). No such mitigating factors are present here. While the defendant cites to certain medical issues in his sentencing submission, *see* Dkt. 84 at 7, none of those medical issues warrants a downward variance in light of the other Section 3553(a) factors described above.

The defendant's reliance on unpublished Sixth Circuit opinion, *People v. Musgrave*, 647 F. App'x 529 (6th Cir. 2016), a case involving a certified public accountant making false representations to obtain a loan in connection with a tire recycling venture, is also misplaced. In *Musgrave*, the district court sentenced the defendant to a non-incarceratory sentence, and the Government subsequently appealed that sentence, arguing that it was substantively unreasonable. In finding that the district court's imposition of a non-custodial sentence was not clearly erroneous, the Sixth Circuit noted the district court's acknowledgment of the significant mitigating factors in that case, "particularly Musgrave's intentions to start a business and not to 'line his pockets with someone else's hard-earned money,' that he received no profit from his crimes, and that his criminal conduct included only one transaction." *People v. Musgrave*, 647 F. App'x 529, 537 (6th Cir. 2016). Here, the facts could not be more different. The defendant was in a position of public trust and abused that position to do exactly what Musgrave did not: he committed fraud over the course of years to line own pockets with money he stole from the hard-working union members he pledged to protect.

*Finally*, the mitigating factors identified by Probation (and also cited by the defendant) in connection with its recommendation of a 24-month sentence do not outweigh the other 3553(a) factors that support a more significant sentence. *See* PSR at 21-22. For example, that the defendant has no prior criminal history is unsurprising: if he had prior criminal convictions, he would not have been in the position of power within the NYPD that allowed him to commit the instant offense. And, as described above, his 39 years of service in the NYPD and familial ties do not warrant a lesser sentence in this case, particularly in light of the seriousness of the defendant's crime and the other Section 3553(a) factors. Nor does his compliance with Court-ordered bail conditions support such a downward variance: the defendant is required to comply with his bail conditions and should not be rewarded for doing so.

Accordingly, the Court should reject the defendant's arguments in favor of a non-custodial sentence, as well as Probation's request for a downward variance.

**Conclusion**

For the reasons set forth above, the Government respectfully requests that the Court sentence the defendant to 41 months' imprisonment, a sentence that is sufficient but not greater than necessary to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: *Alexandra Rothman*
David J. Robles
Alexandra N. Rothman
Assistant United States Attorneys
(212) 637-2550 / -2580

Cc: Thomas Kenniff, Esq. (by ECF)